# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF ALASKA

In re:

ALASKA FUR GALLERY, INC.,

                    Debtor.

Case No. A09-00196-DMD
Chapter 11

> **Filed On**
>
> **4/29/11**

## MEMORANDUM REGARDING DISCLOSURE STATEMENT, CONFIRMATION OF PLAN AND RELATED MOTIONS

The following matters were heard in this court on January 26, 2011, and February 9 and 10, 2011:

- consideration of the debtor's fourth amended disclosure statement (Docket No. 297) and confirmation of the debtor's fourth amended plan (Docket No. 296),

- the debtor's applications for attorney's fees (Docket Nos. 224 and 306),

- this court's *sua sponte* motion to dismiss or convert (Docket No. 288),

- Aasand & Glore's second fee application (Docket No. 305),

- the debtor's motion to approve joint agreement to sell (Docket No. 301), and

- Export Development Canada's request for allowance of administrative expense priority claim (Docket No. 309).

The contested matters are core proceedings under 28 U.S.C. § 157(b)(2)(A), (L), (N), and (O). This court has jurisdiction pursuant to 11 U.S.C. § 1334(b) and the district court's order of reference.

The debtor's fourth amended disclosure statement will not be approved and confirmation of the debtor's fourth amended plan will be denied. However, the debtor will

be given one final opportunity to correct the deficiencies which are discussed below, and file a fifth amended disclosure statement and fifth amended plan. If the debtor fails to achieve approval of its fifth amended disclosure statement and confirmation of its fifth amended plan, however, this case will be dismissed without further notice.

The applications for attorney's fees and costs will be allowed, as will Aasand and Glore's second fee application, but with one reduction in requested fees as to both applications. Neither professional is entitled to recover fees incurred in the bankruptcy case of Hernandez & Associates, LLC ("H&A"), Main Case No. A09-00516-DMD, from AFG. Instead, application for allowance of those fees should be made in the H&A bankruptcy case.

The debtor's motion to approve joint agreement to sell will be granted. A ruling on Export Development Canada's request for allowance of administrative expense priority claim will be deferred pending the amendment of the debtor's disclosure statement and plan.

I.   Background

Alaska Fur Gallery ("AFG") is one of a number of business entities owned by members of the Hernandez family. Five members each hold a twenty percent interest. They include: (1) Magdalena ("Malena") Hausinger, (2) Hiram G. Hernandez, Jr., (3) Patricia H. Dibenedetto, (4) Miriam Hernandez, and (5) Manual Hernandez. AFG operated a fur store in Anchorage for many years. It also operated summer stores in Ketchikan, Skagway and

2

Juneau.  The Ketchikan store is no longer operative.  Additionally, AFG had winter stores in certain resort destinations.  None of the winter resort stores are now active.  The same family members also own Hernandez & Associates, LLC ("H&A").  The AFG owners, along with two more siblings, Marco Hernandez and Luis Hernandez, own H&H Development, Inc., as well.

In the course of its fur operations, AFG purchased real property in Juneau on 317 South Franklin Street.  H&A purchased property nearby, at 359 South Franklin Street. Both properties are adjacent to a cruise ship dock in Juneau.  They are used as retail locations for tourist shops and have produced substantial rental income.  H&A conveyed its interest in 359 South Franklin to AFG  on April 3, 2009, just four days before AFG filed its chapter 11 petition.  H&A also owns retail property in Skagway that produces rental income.  H&H owns one lot on Abbott Road in Anchorage.

In 2003 and 2004, AFG invested in The Inn at Whittier ("the Inn"), a hotel and restaurant located in Whittier, Alaska.  AFG borrowed funds from First National Bank Alaska ("FNBA") to finance the Inn.  To complete the project, AFG also encumbered its Juneau and Skagway real property.  The Inn failed.  It filed for chapter 11 relief in April of 2006.  This court approved the Inn's chapter 11 plan on May 15, 2007.  The plan failed, however, and FNBA later foreclosed on the project.

AFG sued FNBA for misrepresentation and violation of state security laws in 2006.  After a six week jury trial, the jury found for FNBA.  The bank sought to foreclose

3

on its deeds of trust and recover all funds due it.  To avoid the foreclosure sales, AFG filed

for chapter 11 relief on April 7, 2009.  H&A filed its chapter 11 petition just over three

months later, on July 29, 2009.  AFG, after its petition was filed, entered into adequate

protection agreements with FNBA regarding the continued use of the bank's collateral.  AFG

has been making the payments called for by these agreements.

AFG has filed a series of chapter 11 plans and disclosure statements.  Its

reorganization proposals have been in a state of perpetual flux.  AFG was unable to bring its

first four plans to confirmation over an extended period of time.

During the pendency of this bankruptcy, AFG moved for a new trial in the state

court action it had filed against FNBA.  The state court granted AFG's motion.  A second

jury trial was held in Anchorage in November and December of 2010.  Unfortunately for

AFG, the second jury trial went poorly.  The jury awarded damages of $675,000.00, but

allocated just 14% of the fault to FNBA.  It allocated 41% of the fault to AFG's former co-

owner, Ed Cronick, and 45% to AFG.  The state court litigation is still ongoing.  The debtor's

liability for FNBA's litigation costs could total $1.7 million or more.

The debtor's fourth amended disclosure statement and plan finally came before

this court for hearing in January and February of 2011, following AFG's second unsuccessful

jury trial in state court.  Contemporaneously with these matters, the court also heard the

debtor's applications for attorneys fees and motion to approve joint agreement to sell, Aasand

& Glore's second fee application, Export Development Canada's request for allowance of

4

administrative priority expense claim, and this court's *sua sponte* motion to convert or dismiss. All matters are now ripe for decision.

## II. Disclosure Statement

Under 11 U.S.C. § 1125(b), a debtor cannot solicit the acceptance or rejection of a plan of reorganization without first obtaining court approval of a disclosure statement. The disclosure statement must contain "adequate information."[1] The Bankruptcy Code defines "adequate information" as:

> [I]nformation of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information[.][2]

---

[1] 11 U.S.C. § 1125(b).

[2] 11 U.S.C. § 1125(a)(1).

At a disclosure statement hearing, the debtor bears the ultimate burden of persuasion.[3] Here, I find that the debtor has not carried this burden.

In the course of hearings on the fourth amended disclosure statement and plan, AFG amended or modified several exhibits to the disclosure statement. First, the evidence regarding the value of AFG's real property was modified. Exhibit Q to the fourth amended disclosure statement was a broker's opinion of value from Juneau realtor Larry Spencer pertaining to the debtor's Juneau and Skagway properties. At the February 8, 2010, hearing, the debtor conceded Spencer's conclusions were in error and submitted limited appraisals for both 317 and 359 South Franklin in Juneau.[4] The appraisals were performed by Kim Wold. Wold's appraisal for 317 South Franklin indicated that this property was worth $3.6 million rather than the $5.2 million Spencer alleged. Wold's appraisal for 359 South Franklin reflected that the value of this property was $2.4 million rather than $3.4 million alleged by Spencer.

In spite of the significantly reduced values for AFG's Juneau properties, as reflected in Wold's appraisals, AFG did not update Spencer's conclusions regarding the value of its Skagway real property. Its failure to obtain a competent broker's opinion of value or even a limited appraisal for the Skagway property makes the disclosure statement

---

[3] *Official Comm. of Unsecured Creditors v. Michelson (In re Michelson)*, 141 B.R. 715, 718-719 (Bankr. E.D. Cal. 1992).

[4] AFG's Notice of Filing Appraisals and Revised Ex. T, filed Feb. 8, 2011 (Docket No. 332). The appraisals were admitted as debtor's Q-1 and Q-2.

inadequate.[5]  Further, AFG did not amend its liquidation analysis, Exhibit L to the disclosure statement, although the reduced property values would clearly impact this analysis.

Other exhibits to the disclosure statement were amended or modified by AFG as well.  The debtor replaced its original Exhibit F with a revised Exhibit F.  This exhibit covered the debtor's pro-forma projections from 2010 to 2011.  Exhibit M, which summarizes payments to creditors over a five year period, was also replaced with a revised exhibit.  Finally, on February 8, 2011, the debtor replaced original Exhibit T with a revised Exhibit T.  This exhibit was submitted to show the tax basis in the debtor's real estate, the estimated fair market value of and debt against the real estate, and feasibility of the plan.

The changes to the exhibits are not petty or inconsequential.  They are significant changes involving millions of dollars.  They were not incorporated into an amended disclosure statement.[6]  FNBA and the debtor's other creditors have not been given an opportunity to object to them, nor have they been approved by the court.

Other issues surrounding the disclosure statement have been litigated for a prolonged time.  The debtor's second amended disclosure statement was before this court in May of 2010.  FNBA objected to AFG's disclosures surrounding the state court litigation.  I determined that its objections were well founded:

_____

[5]  This issue has surfaced before.  In May of 2010, this court advised AFG to obtain, at a minimum, broker's opinions of value on its real property holdings, including the Skagway property, and annex those to the revised disclosure statement.  *See* Mem. Regarding Disclosure Statement, filed May 25, 2010 (Docket No. 230), at 5.

[6]  If the debtor had done so, this would have been its fifth amended disclosure statement.

7

FNBA next maintains that AFG has failed to make a number of disclosures with regard to the pending state court litigation between the bank and the debtor, including: 1) no disclosure of the first trial and the resulting verdict; 2) no disclosure of the fees and costs which have been incurred or that will be incurred by FNBA; 3) no disclosure of the litigation costs incurred by the debtor so far or estimate of costs for completing the litigation; and 4) no discussion of how pursuit of the litigation will benefit the debtor and the estate. I agree with FNBA that all these disclosures should be made. The disclosure statement should also discuss the potential of a second adverse judgment and how such a judgment would impact the debtor and its reorganization efforts.[7]

AFG's fourth amended disclosure statement does not adequately address the ongoing litigation with FNBA. It still fails to disclose the first jury trial and the negative verdict AFG received. Page 2 of the amended disclosure statement contains the following brief description:

In 2006, AFG filed a state court lawsuit . . . against the bank alleging that the bank had intentionally deceived the Hernandezes by misrepresenting known problems with [the Inn], and that the Bank acted in violation of state security laws. After a nearly six week jury trial, the jury returned a special verdict form containing 25 questions plus two follow-up verdict forms requesting clarification of the jury's finding. The

---

[7] Mem. Regarding Disclosure Statement (Docket No. 230), at 4-5.

8

> State Court Action is discussed in more detail in
> [Article] 7 below.[8]

This brief description gives no indication that the first jury verdict was adverse to AFG. Nor

does Article 7 clarify this point. In fact, Article 7 doesn't mention the first jury trial at all,

instead addressing just the second trial:

> The Plan provides that the State Court
> Action against FNBA will proceed. On
> December 8, 2010, following a six week jury trial,
> the jury answered a 25-question special verdict
> form plus two subsequent requests for
> clarification from the state court. The jury found
> that plaintiff's damages caused by the bank's
> negligence were $675,000. The jury also
> allocated fault 14% to the bank, 41% to former
> Inn at Whittier co-owner Ed Cronick, and 41%
> [sic] to the plaintiffs. This award was less than
> the plaintiffs had sought, but the plaintiffs were
> nonetheless the prevailing party. There are
> expected to be substantial post-trial motions,
> including motions for attorney fees.[9]

Not only does the disclosure statement completely overlook the result of the

first jury trial, its terse analysis of the second trial leaves out significant details. The purpose

of AFG's suit was to nullify the notes and deeds of trust it had given to FNBA to finance the

Inn.[10] If successful, AFG would have received more than $4.5 million in value and, possibly,

---

[8] Debtor's Fourth Am. Disclosure Statement, filed January 3, 2011 (Docket No. 297), at 2. This passage references "Section 7," which is actually to "Article 7" of the document.

[9] Fourth Am. Disclosure Statement (Docket No. 297), at 21. Fault apportioned to AFG was 45%, rather than 41% as stated in the document.

[10] Decl. of Malena Hausinger, filed Jun. 22, 2009 (Docket No. 60), ¶ 7.

9

punitive damages as well.[11]  Instead, AFG has received a paltry verdict of just $94,500.00 against FNBA.  The jury also found that the debtor was more than three times as responsible for the losses:  45% or $303,750.00.[12]  The disclosures regarding the first trial are non-existent and, as to the second trial, wholly inadequate.

Further, as noted above, this court required the amended disclosure statement to discuss the fees and costs which had been incurred or that would be incurred by FNBA.  The fourth amended disclosure statement discusses this issue as follows:

> One risk factor associated with this plan is an adverse judgment against AFG in the State Court Action for costs; however, the plan is still feasible in that event.  FNBA asserts $850,000 in litigation costs in Claim S-1G after the first trial.  Assuming the second trial costs about as much as the first trial, then the worst case for a Claim S-1G claim would be in the neighborhood of $1.7 million . . . . [13]

Given the debtor's stated purpose of continuing the fight through post-trial motions and appeal, this information is inadequate.  FNBA will continue to incur substantial attorney fees and costs as this litigation continues.  If AFG's litigation strategy fails, it will be liable for these additional expenses.  Yet, this potential risk is not disclosed.

_____

[11]  FNBA's Obj. to Debtor's Fourth Am. Disclosure Statement and Fourth Am. Plan, filed Jan. 24, 2011 (Docket No. 325), at 6 n.4.

[12]  *Id.*, Ex. 1 at 3, 10.

[13]  Fourth Am. Disclosure Statement (Docket No. 297), at 22.

10

The disclosure statement also overlooks AFG's own litigation costs, despite this court's prior instruction that this information be provided.[14]  We are informed that the debtor's projections do not include costs of litigation because "attorney Don Bauermeister is on a contingency fee and has agreed that AFG is not liable for pre-petition or post-petition costs of the litigation, except out of proceeds of settlement or collection."[15]  This statement simply does not answer the question.  What are the costs?  Are they so substantial that they could consume any possible recovery?  And how much more will it cost to continue with the litigation?  This is a risk factor which, like FNBA's litigation costs, must be addressed.

Further, the disclosure statement does not adequately explain how pursuit of AFG's litigation against FNBA has benefitted the estate or will benefit it in the future.  The disclosure statement does state the amount of the most recent jury verdict, and concedes that the award is less than what AFG had hoped.  However, it goes on to say that a more detailed description of the verdict, the parties' contentions, and the possible outcomes post-trial would "serve no useful purpose" and concludes that it is "sufficient to state that the litigation is ongoing and will be the subject of further motion practice and possible appeal."[16]  This statement sidesteps the issue entirely.  Considering that AFG was completely unsuccessful

---

[14] Mem. Regarding Disclosure Statement (Docket No. 230), at 4-5.

[15] Docket No. 297, p. 22.

[16] Fourth Am. Disclosure Statement (Docket No. 297), at 21.

in the first trial, and nominally successful in the second, how will its continuance of this litigation benefit the estate?

The disclosure statement represents that FNBA's additional litigation costs from the second trial will not impact its reorganization efforts but, as noted above, the details on this point are not clear. AFG also submitted an amended Exhibit T, which deals with plan feasibility. The projections in the original Exhibit T were erroneous because they did not include the estimated $1.7 million in potential litigation costs to FNBA. Even with this amended exhibit, however, the fourth amended disclosure statement fails to provide adequate information on the treatment of FNBA costs.

In an earlier memorandum regarding the debtor's second amended disclosure statement, I stated:

> FNBA raises additional issues with regard to AFG's disclosure of debts to family members and related entities. It says these disclosures are inadequate. According to FNBA, $1.65 million in AFG assets disappear in the disclosure statement. I feel that the debtor should more thoroughly explain the reason for this discrepancy. FNBA further objects to certain of the bankruptcy journal entries, arguing that they eliminate a $1.1 million asset, a debt from H&H to AFG. The debtor should explain the loss of this apparent asset as well.[17]

In Exhibit N-2, "Application of H&H Development Receivable," the debtor explained the reason for the loss of the $1.6 million debt from H&H. According to page 2 of Exhibit N-2,

_____

[17] Mem. Regarding Disclosure Statement (Docket No. 230), at 3-4.

the debt was "adjusted" to the AFG owners in amounts from $224,000.00 to nearly $400,000.00. At the hearings, AFG offered the testimony of Mr. Aasand to explain the rationale for making the adjustments. Mr. Aasand's testimony need not be summarized or made part of the disclosure statement. It's a confirmation issue between FNBA and the debtor. Further disclosures are pointless.

The first page of Exhibit N-2 was to provide the rationale behind the loss of a $1.1 million receivable from H&H. This page contains a series of bankruptcy journal entries and numbers, ending with "Net application of H&H Development Receivable" of about $1.1 million. The liability was shifted to AFG owners. Mr. Aasand's testimony at the hearings explained his rationale. Further explanations in the disclosure statement are unnecessary.

One additional problem with the disclosure statement deserves mention. Export Development Canada ("EDC") has received a personal guaranty for the payment of $30,000.00 in attorney's fees from the debtor's five shareholders. However, the fourth amended disclosure statement doesn't mention this guaranty in the section dealing with unsecured creditors. It should have been disclosed to all creditors prior to the solicitation of votes.

The fourth amended disclosure statement lacks adequate information on several points. It overstated the debtor's assets by millions of dollars based upon erroneous broker's opinions of value. It failed to provide independent valuations of the debtor's Skagway properties. Additionally, the debtor failed to include information specified by this court after

13

earlier hearings on prior disclosure statements, particularly with regard to the benefits, risks and potential liabilities which might accrue to AFG from the ongoing litigation with FNBA. Further, the pending disclosure statement does not sufficiently disclose personal guaranties given to EDC by the debtor's shareholders. The fourth amended disclosure statement cannot be approved. But even if I were to conclude otherwise, the plan itself is not confirmable.

## III. Confirmation

AFG "has an affirmative duty to propose a plan that complies with the requirements of the bankruptcy code."[18] Further, the bankruptcy court has an independent duty to ensure that the plan complies with the applicable provisions of the Code.[19] The court must exercise this duty "to make certain that the requirements for confirmation have been met, whether or not a creditor objects."[20]

> The confirmation hearing is no ministerial exercise. The court is acting as a court of equity and must assure itself that the plan is likely to succeed. This requires that the court make an informed, independent judgment regarding each element of confirmation.

---

[18] *Everett v. Perez (In re Perez)*, 30 F.3d 1209, 1213 (9th Cir. 1994).

[19] *Id.*

[20] *Varela v. Dynamic Brokers, Inc. (In re Dynamic Brokers)*, 293 B.R. 489, 499 (B.A.P. 9th Cir. 2003), *citing Perez*, 30 F.3d at 1213 ("[T]he court itself must pass on [confirmation] issues, whether or not they're specifically put in dispute."); *see also Liberty Nat'l Enterp. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd. P'ship)*, 115 F.3d 650, 653 (9th Cir. 1997), *cert. denied*, 522 U.S. 1110 (1998) ("The bankruptcy court had an affirmative duty to ensure that the Plan satisfied all 11 U.S.C. § 1129 requirements for confirmation.").

The requirement that the court exercise its independent judgment has persisted since the days of equity receiverships, continuing through reorganization under Bankruptcy Act § 77B, and into the 1978 Bankruptcy Code. It remains the law that "[e]very important determination by the court in receivership [now reorganization] proceedings calls for an informed, independent judgment." Or, as the Supreme Court said in *Los Angeles Lumber* and reiterated in *City of Avon Park*, the "court is not merely a ministerial register of the vote of the several classes of security holders."

The court must apply its informed, independent judgment to all elements of sections 1129(a) and (b), not merely to the "fair and equitable" requirement of section 1129(b) that applies only in so-called "cram down" situations.[21]

The bankruptcy court must confirm a chapter 11 debtor's plan if the debtor proves, by a preponderance of the evidence, either (1) that the plan satisfies all of the requirements found in 11 U.S.C. § 1129(a) or, (2) if the only condition not satisfied is the requirement found in § 1129(a)(8), "that the plan satisfies the 'cramdown' alternative to this condition found in 11 U.S.C. § 1129(b)."[22] Here, confirmation must be denied because AFG has not established, by a preponderance of the evidence, that its fourth amended plan satisfies all of the requirements of § 1129.

---

[21] *In re Michelson*, 141 B.R. at 720-21 (citations omitted).

[22] *Ambanc La Mesa Ltd. P'ship*, 115 F.3d at 653; *see also* 7 *Collier on Bankruptcy* ¶ 1129.02 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).

15

<u>11 U.S.C. § 1129(a)(1):</u>

Section 1129(a)(1) mandates that a plan comply with the applicable provisions of Title 11.  Under § 1123(a)(1), a plan must designate classes of interests as well as classes of claims.  The plan must further specify any class of interests which is not impaired and, if a class of interests is impaired, the plan must specify the treatment for such class.[23]  AFG's fourth amended plan does not satisfy these requirements.  It doesn't designate classes of interests nor does it specify possible impairment or treatment of such interests.  Another subsection of § 1123(a) requires a corporate debtor's charter to contain "a provision prohibiting the issuance of nonvoting equity securities."[24]  AFG's pending plan does not include such a provision.  The plan does not satisfy § 1129(a)(1) because it is not in compliance with § 1123(a), an "applicable provision" of Title 11.

<u>11 U.S.C. § 1129(a)(3):</u>

Section 1129(a)(3) requires that the plan be "proposed in good faith and not by any means forbidden by law."[25]  "The term 'law' in this provision includes state law,"[26] and the plan must comply with state law unless it has been preempted by the Bankruptcy

---

[23] 11 U.S.C. § 1123(a)(2), (3).

[24] 11 U.S.C. § 1123(a)(6).

[25] 11 U.S.C. § 1129(a)(3).

[26] *In re Jandous Elec. Const. Corp.,* 115 B.R. 46, 51 (Bankr. S.D.N.Y. 1990), *citing Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 787 F.2d 1352, 1360 (9th Cir. 1986); *In re Koelbl*, 751 F.2d 137, 139 (2d Cir. 1984).

16

Code.[27]  In instances where a plan provision conflicts with state law, most bankruptcy cases indicate that bankruptcy law will control so long as the questioned provision is within the confines of § 1123.[28]

As noted above, the same five family members who hold equity interests in AFG also own Hernandez and Associates, LLC ("H&A").  H&A filed a chapter 11 petition roughly three months after AFG, on July 29, 2009.[29]  It never filed a plan or disclosure statement, and moved to dismiss its chapter 11 case on February 4, 2010.[30]  FNBA opposed the motion.[31]  The hearing on AFG's motion has been continued several times but has never been heard on the merits.  This court moved, *sua sponte*, to dismiss or convert H&A's chapter 11 case on December 22, 2010.[32]   H&A filed a response indicating that if confirmation of AFG's plan should be denied or delayed, its case should be dismissed.[33]

AFG's fourth amended plan provides that, on the effective date:

> 2.2.3     Debtor shall cause H & A to convey the Skagway property to AFG and shall thereafter market that property for sale.  When

---

[27] *Settling States v. Carolina Tobacco Co. (In re Carolina Tobacco Co.)*, 360 B.R. 702, 711 (D. Or. 2007).

[28] 7 *Collier on Bankruptcy* ¶ 1129.02[3][b][i].

[29] *In re Hernandez & Assoc., LLC*, Main Case No. 09-00516, Docket No. 1 (Petition).

[30] *Id.*, Docket No. 34 (H&A's Mot. to Dismiss).

[31] *Id.*, Docket No. 36 (FNBA's Opp'n to Mot. to Dismiss).

[32] *Id.*, Docket No. 58 (Court's Mot. to Dismiss or Convert).

[33] *In re Hernandez & Assoc., LLC*, Main Case No. 09-00516, Docket No. 62 (H&A's Resp. to Court's Mot.).

> that property sale closes, up to 50% of the Net
> Sale Proceeds shall be paid, pro-rata, to the Class
> U-2 Option A creditors. The remainder of the Net
> Sale Proceeds shall be paid to AFG, which shall
> thereupon use those funds to pay unpaid
> Chapter 11 administrative expenses, and the
> balance for working capital.[34]

AFG will pay nothing for the Skagway property. The projected net sale proceeds from this property are $368,000.00.[35]

      In its Schedule F, H&A lists three unsecured debts, totaling about $1.7 million, owed to FNBA.[36] Schedule F indicates that the three obligations are secured by a first, second and third deed of trust on the 359 South Franklin property in Juneau. H&A conveyed this parcel to AFG just before AFG's petition was filed, so FNBA's claims are not secured by assets of H&A's estate.[37] Creditors other than FNBA have also filed unsecured claims in H&A's case.[38]

---

[34] AFG's Fourth Am. Plan of Reorganization, filed Jan. 3, 2011 (Docket No. 296) at 10.

[35] Fourth Am. Disclosure Statement (Docket No. 297), Ex. F at 1.

[36] *In re Hernandez & Assoc., LLC*, Main Case No. 09-00516, Docket No. 14 at 8 (Sched. F).

[37] FNBA filed secured claims in the H&A bankruptcy totaling about $2.5 million. *See In re Hernandez & Assoc., LLC*, Main Case No. 09-00516, Claims Nos. 2-1, 3-1, 4-1 and 5-1. H&A says the claims based upon the deeds of trust are unsecured because it is a co-obligor on the three deeds of trust, and that the remaining claim, which is for FNBA's attorney's fees in the state court suit, is contingent, unliquidated and disputed. *Id.*, Docket No. 62 (H&A's Resp. to Court's Motion to Convert).

[38] *See In re Hernandez & Assoc., LLC*, Main Case No. 09-00516. The Internal Revenue Service has filed Claim No. 1-1, as a priority claim for $1,250.00 and an unsecured claim for $1,376.20. Kirk Loeffler has filed an unsecured claim for $90,609.89 (Claim No. 6-1), and has also filed a priority claim for the same amount on behalf of the Internal Revenue Service (Claim No. 7-1).

The proposed transfer of H&A's Skagway property to AFG violates Alaska law. H&A is a limited liability company. It cannot transfer the Skagway property if the effect of that distribution would be to render H&A unable to pay its debts in the usual course of its business.[39]

Once H&A conveys the Skagway parcel to AFG, it will have no assets of any substance.[40] It will be unable to pay its debts following the distribution. Further, H&A may be winding up its affairs. If so, its assets must be distributed first to H&A creditors before any others are paid.[41] The proposed transfer of the Skagway property also has the hallmarks of a fraudulent transfer under Alaska law. Such a transfer is void.[42]

Nor would the transfer be allowable under 11 U.S.C. § 1123. Section 1123 sets out the requirements and limitations on plan contents. Nothing in § 1123 allows H&A to transfer its assets to AFG and its creditors as part of AFG's plan of reorganization. Subsection 1123(a)(5)(B) would permit AFG to transfer *its* property to another entity. The Skagway parcel is not property of the AFG estate, however. The fact that H&A is itself in chapter 11 does not alter my conclusion. H&A is seeking dismissal of its petition. It has not filed a plan in accordance with § 1123 seeking to transfer the Skagway property to AFG. Nor

---

[39] A.S. 10.50.305(a)(1).

[40] *In re Hernandez & Assoc., LLC*, Main Case No. 09-00516, Docket No. 14 (Schedules A, B). The Skagway parcel is scheduled with a fair market value of $218,700.00. The scheduled value of H&A's personal property is just $22,043.00.

[41] A.S. 10.50.425(1).

[42] A.S. 34.40.010.

19

have AFG and H&A moved for consolidation of the two bankruptcy estates.  State law

precludes this transfer, and there is nothing in § 1123 which would permit H&A to

circumvent this.  Accordingly, the debtor's fourth amended plan violates § 1129(a)(3).


11 U.S.C. § 1129(a)(11):

Section 1129(a)(11) deals with plan feasibility.  This subsection requires the

debtor to establish that "[c]onfirmation of the plan is not likely to be followed by the

liquidation, or the need for further financial reorganization, of the debtor or any successor

to the debtor under the plan, unless such liquidation or reorganization is proposed in the

plan.[43]   As the Ninth Circuit has noted, the purpose of this subsection "is to prevent

confirmation of visionary schemes which promise creditors and equity security holders more

under a proposed plan than the debtor can possibly attain after confirmation."[44]  The debtor

must demonstrate that the plan has a "reasonable probability of success,"[45] by showing that

"the things which are to be done after confirmation can be done as a practical matter under

the facts."[46]  "The Code does not require the debtor to prove that success is inevitable, and

---

[43] 11 U.S.C. § 1129(a)(11).

[44] *Pizza of Hawaii, Inc. v. Shakey's Inc. (In the Matter of Pizza of Hawaii, Inc.)*, 761 F.2d 1374, 1382 (9th Cir. 1985).

[45] *In re Acequia, Inc.*, 787 F.2d 1364.

[46] *Jorgensen*, 66 B.R. at 108.

20

a relatively low threshold of proof will satisfy § 1129(a)(11), so long as adequate evidence supports a finding of feasibility."[47]

Feasibility is a factual determination which the bankruptcy court makes on the evidence before it.[48]

> Feasibility can be established through the testimony of experts and those knowledgeable of the future prospects of the reorganized debtor. The inquiry is on the viability of the reorganized debtor, and its ability to meet future obligations, both as provided in the plan and as may be incurred in operations. Particularly important in this regard is that the plan proponent demonstrate that any necessary financing has been obtained, or is likely to be obtained.[49]

Bankruptcy courts have denied plan confirmation in instances where the plan proponent has failed to adequately demonstrate that necessary financing will be available or, where feasibility turns on future sales or refinancings of property, if the plan proponent has failed to show that such events are likely to occur.[50]

> If a final payment, in the form of a "balloon" payment, is proposed to come from new financing to be acquired by the Debtor in the form

---

[47] *Computer Task Group, Inc. v. Brotby (In re Brotby)*, 303 B.R. 177, 191 (B.A.P. 9th Cir. 2003) (citations omitted).

[48] *Ambanc La Mesa Ltd. P'ship*, 115 F.3d at 657, *citing Jorgensen v. Fed. Land Bank of Spokane (In re Jorgensen)*, 66 B.R. 104, 108 (B.A.P. 9th Cir. 1986).

[49] 7 *Collier on Bankruptcy* ¶ 1129.02[11](Alan N. Resnick & Henry J. Sommer eds., 16th ed.).

[50] *Id.* n.192 (citing cases); *see also In re Linda Vista Cinemas, L.L.C.*, 442 B.R. 724, 738 (Bankr. D. Ariz. 2010).

> of some new lending vehicle, then proof of feasibility is necessary. Whether that balloon payment can likely be made, and new financing acquired, requires credible evidence proving that obtaining future financing is a reasonable likelihood.[51]

Finally, in instances where a chapter 11 debtor is engaged in ongoing civil litigation, "a plan must take into account the possibility that a potential creditor may, following confirmation, recover a large judgment against the debtor," because this possibility also impacts the feasibility determination under § 1129(a)(11).[52]

### Real Property Values and FNBA Costs

The feasibility of AFG's plan is dependent upon the sale of its various parcels of real property both in the short and long term. AFG has failed to support its short-term sales with appropriate evidence. AFG has made an adequate showing regarding the values of its Juneau properties, which it proposes to sell in the fifth year of the plan. Values for the Anchorage lot and Skagway properties have not been adequately established, however.

The first parcel to be sold under the plan is AFG's Anchorage store. According to the plan, this property can be sold for $1,250,000.00. AFG has provided very little evidence to support a sale for this amount. It has submitted a proposed joint agreement

---

[51] *In re Linda Vista Cinemas*, 442 B.R. at 738.

[52] *Sherman v. Harbin (In re Harbin)*, 486 F.3d 510, 517 (9th Cir. 2007). A bankruptcy court's failure to consider such a possibility is clear error. *Id.* at 518.

between itself and its landlord for the sale of this property.[53]   Under this agreement, the

landlord is to receive a minimum of $650,000.00 from the sale.  Malena Hausinger believes

the fee interest is worth $1.5 million, but gives no factual basis for her opinion.  The original

cost for the AFG building and an adjacent lot was $368,375.00.[54]  The building is run down

and very energy inefficient.   It is located in a marginal area of downtown Anchorage.

Hausinger said that a real estate broker with Bond Stephens & Johnson thought he could sell

the property for $1.25 million by October 2011.  AFG has employed Marc Dunne, of Bond

Stephens & Johnson, as a broker for AFG, but Mr. Dunne was not called as a witness.

Another broker has estimated the debtor's leasehold value to be $410,000.00 as of July 13,

2010,[55] but he was not called as a witness either.  The building currently has a large "FOR

SALE OR LEASE" sign in its front window on Fourth Avenue.   No appraisal of the fee

interest was submitted by the debtor.  The plan doesn't contemplate a lease of this property,

if it should fail to sell.

Nor is there a basis for concluding that the Skagway property at 505 South

Broadway will sell and net the debtor $368,000.00 in May of 2012.  As noted earlier, the

plan's proposed transfer of this property from H&A to AFG is contrary to state law and not

otherwise allowable under § 1123.  But even if the sale were permissible, there is no

---

[53] Fourth Am. Disclosure Statement (Docket No. 297), Ex. J; Amended Ex. J, filed Jan. 4, 2011 (Docket No. 299).

[54] Debtor's Ex. T and Revised Ex. T.  These exhibits do not reveal when the costs were incurred. Nor do they indicate how the land cost should be allocated between the two parcels.

[55] Debtor's Ex. Ex. Q (Letter from Mark Rowley, Pacific Tower Properties, Inc.).

evidence, in the form of either an appraisal or a broker's opinion of value, to justify the debtor's optimistic projections. AFG has withdrawn the broker's opinion of value it previously submitted on the Skagway property. At one time AFG indicated a sale of this property to its tenant was in progress, but that sale failed. No credible evidence has been submitted to show that the debtor's efforts to sell the Skagway parcel would be more successful this time around.

The remainder of the debtor's properties are to be refinanced or sold in 2015 to pay all creditors in full. These properties include a lot located at 422 West Fourth Avenue, adjacent to AFG's Anchorage store. On July 2, 2010, Mark Rowley of Pacific Tower Properties prepared a broker's opinion of value which stated that the fair market value for this parcel, which includes a small building, was $420,000.00.[56] Rowley submitted a number of current listings to buttress his findings. They had a wide range of listing prices and were not truly comparable. Further, Rowley did not testify at the confirmation hearing. Hausinger thinks the property is worth $400,000.00 or more but, again, there is no independent evidence to support her views.[57] Nor has any credible evidence been submitted as to whether this parcel will appreciate or depreciate in five years' time. AFG has not sustained its burden of

---

[56] *Id.*

[57] Credible evidence would include an analysis of comparable sales, utilization of the income approach, or application of the cost approach to value. The Municipality of Anchorage did appraise this lot at $416,600.00 in 2010 (*see* Fourth Am. Disclosure Statement (Docket No. 297), Ex. Q at 5-7), but the debtor never moved to admit the tax statement into evidence. Further, tax appraisals are notoriously inaccurate.

proof in establishing the value of the lot in five years.  Nor has it shown the likelihood of successfully refinancing or selling this parcel in 2015.

Similar issues exist with regard to the Juneau properties.  AFG alleges that the Juneau property at 317 South Franklin will have a value of $3.585 million in 2015.[58]  This property is currently leased up and fully occupied by tenants.  The 2011 leased fee value was rendered by Kim Wold on a limited appraisal based solely on the income capitalization approach.[59]  Wold was credible and optimistic about the future.  He thought Juneau passenger traffic from cruise ships would increase this summer as well as in 2012 and 2013.  He contended the value of the Juneau properties should increase 4 to 5 percent per year.  By 2015, he thought their value could increase 20 to 25%.  Malena Hausinger shares Wold's optimism.  According to her, the overall national economy has improved and the number of cruise ship visitors should substantially increase over the next five years.

I am not quite as optimistic.  With national unemployment still hovering near 9%, and gas prices rapidly increasing due to turmoil in the Middle East, economic growth in the United States will improve slowly.  Although the debtor's tax returns reflect a decline in gross income averaging about 12.5% per year between fiscal year 2006 and 2009,[60] for

---

[58] Debtor's Revised Ex. T.

[59] Debtor's Ex. Q-1.

[60] I computed this decline based upon the debtor's summary of tax returns from 2006 through 2009. *See* Fourth Am. Disclosure Statement (Docket No. 297), Ex. V.

fiscal year 2010, AFG's gross income rose  about 5% over fiscal year 2009.[61]  Appreciation

of five percent a year for five consecutive years is unlikely.  A more likely scenario would

be modest growth of four percent for 2011, 2012 and 2013.  Wold indicated growth would

plateau in 2013.[62]  His assessment on this point is credible, and I adopt it here to find that a

value of $4 million would be realistic for liquidation of the property during 2015.  This value

is in excess of the debtor's estimate of $3.585 million shown on revised Exhibit T.  AFG has

sustained its burden of proof as to the projected sale value of the 317 South Franklin property

in 2015.

The debtor predicts a value of $2.42 million for the second Juneau property,

359 South Franklin, in 2015.  As before, Kim Wold prepared a credible limited appraisal

based solely on the income capitalization approach.  I do find that the debtor's $2.42 million

value for 2015 is supported by a preponderance of the evidence.  As with 317 South Franklin,

12% appreciation from 2011 to 2015 is reasonable.  The property should have a value of

$2.71 million in 2015.

The final property AFG proposes to sell in 2015 is the building located at

363 Second Avenue in Skagway.  The debtor predicts a sales price of $675,000.00 in 2015,

but withdrew the broker's opinion of value it had submitted for this property.  AFG has not

---

[61] I determined the debtor's gross income for fiscal year 2010 based upon the debtor's monthly
reports and the debtor's Summary of Tax Returns (Ex. D to the Fourth Amended Disclosure Statement).

[62] This statement is inconsistent with his statement that the property would appreciate 20 to 25% in
five years.

26

provided a replacement broker's opinion of value or an appraisal. Although Malena Hausinger thinks the property will sell for this sum, without competent expert testimony to back up her opinion, AFG has failed to satisfy its burden of proof as to the feasibility of this sale.

There is one other aspect of the debtor's proposed real property sales which I feel negatively impacts overall plan feasibility. AFG plans to sell two parcels of real property in Juneau and one parcel in Skagway in 2015. Juneau and Skagway are both very small markets for commercial properties. By putting all these parcels up for sale at the same time, AFG may saturate both markets. From my perspective, AFG's chances of obtaining the sales prices it has projected would be more likely if it were to start marketing these properties in the third year of the plan. This would give AFG more time and flexibility to seek the best offer for the properties. Further, as Wold noted, the Juneau market may peak in three years. For these reasons, I believe AFG may want to reconsider its plan for marketing these parcels and start the marketing process earlier in the plan term.

FNBA argues that plan feasibility cannot be determined absent an estimate of its litigation expenses from the state court action. I agree. "To be feasible . . . , a plan must take into account the possibility that a potential creditor may, following confirmation, recover a large judgment against the debtor."[63] I estimate FNBA's cost claim to be a secured claim

---

[63] *In re Harbin*, 486 F.3d at 517, *citing Pizza of Hawaii, Inc.*, 761 F.2d 1374, 1382 (9th Cir. 1985).

in the sum of $1.7 million.[64]   Under the debtor's fourth amended plan, FNBA's cost claim

is to receive interest at 3.5%.[65]   The state court statutory judgment rate is not an acceptable

cramdown rate of interest.  The proper rate of interest is determined by establishing the prime

rate and adding a factor for risk.[66]  Given that the prime rate is currently 3.25%, the statutory

rate of 3.5% proposed by AFG is unrealistically low.  If the rate were bumped to prime plus

2.25%, AFG would face a substantial increase in interest charges with a corresponding drop

in accumulated working capital.  If the debtor used the current note rates, interest on FNBA's

litigation expenses would be 6 to 6.5%.  AFG's accumulated working capital would decline

even more.

The debtor states that its real property will be sold or refinanced to pay

creditors.   No credible evidence establishing the debtor's ability to refinance in 2015 was

presented.  Moreover, a refinance is not feasible because it won't yield the funds necessary

---

[64] FNBA filed a claim for its costs of litigation on June 1, 2009 (Claim No. 29-1).  The claim is for
$852,290.40, and FNBA indicates that its costs are secured by real estate and commercial personal property.
FNBA now contends that its cost claim has increased to $1.7 million as a result of the second state court jury
trial.  Provisions in the deeds of trust which accompany FNBA's other proofs of claim indicate that the bank
is entitled to recover its reasonable attorney's fees and costs incurred in litigation with the borrower and that
such fees and costs are secured by the deeds of trust.  The deeds of trust also provide that interest shall accrue
on such fees and costs at the applicable rate provided in the note.  *See* FNBA's Claim Nos. 24-2, 25-1, 26-1,
27-1 and 28-1.  AFG stipulated to relief from the automatic stay as to the state court litigation at Docket No.
218.  Given that FNBA is an oversecured creditor, the automatic stay does not prevent it from obtaining post-
petition liens to secure the attorney's fees and costs it has incurred in the state court litigation, post-petition.

[65] FNBA's litigation expense claim is categorized as Class S-1G in AFG's pending plan.  The plan
confirms that this expense is a secured claim.  The allowed amount is to be determined in the state court
action, and interest on the claim is to accrue at "the court-determined rate."  AFG's Fourth Am. Plan (Docket
No. 296), at 3-4.

[66] *Farm Credit Bank v. Fowler (In re Fowler),* 903 F.2d 694, 698 (9th Cir. 1990).

28

for AFG to fully fund the plan.  According to Kim Wold, the most the debtor could receive from a refinance would be 75% of fair market value.  In five years, using my values as to the Juneau properties and the debtor's values as to the remaining properties, a 75% refinance would yield about $5.8 million.  Including FNBA's litigation expense claim of $1.7 million, plan payments to creditors would total $6.55 million.  Under the refinancing scenario, AFG would come up about $750,000.00 short.[67]  Additionally, considering AFG's history of lender liability litigation, it is conceivable that commercial lenders will decline to do business with the debtor.  Liquidation of the real property provides the only possible means for AFG to pay its creditors in full.

### Projections and Accumulated Working Capital

FNBA has raised a number of issues regarding the debtor's projections and its accumulated working capital found in revised Exhibit T.  This exhibit indicates that the debtor will have over $900,000.00 to apply to balloon payments in 2015.  That figure is based upon a number of assumptions, including the sale of real property early in the case.  As noted previously, the feasibility of these sales has not been established.  Additionally, the debtor's projections for income from operations are overly optimistic and not justified by recent data.  They will not provide the funds needed to establish a $900,000.00 reserve in 2015.

---

[67] For the reasons set forth below, I do not believe that the debtor will have over $900,000.00 in working capital available for debt service in 2015.

The debtor's in-house income statements for calendar years 2009 and 2010 overstate net income.[68] AFG's 2009 net income was $160,000.00 with interest expense of about $78,000.00. Actual interest for the year was over $220,000.00, solely to FNBA. AFG's 2010 net income was listed at $169,000.00 with interest of about $32,000.00. Actual interest exceeded $217,000.00, however. Using accurate interest figures, the debtor's net income decreases substantially.

The debtor's fiscal year projections reflect large increases in "ordinary profit before payment to creditors" which do not conform to the debtor's 2009-2010 fiscal year performance. In fiscal year 2009-2010, AFG's actual profit before payment to creditors was $160,400.00.[69] In fiscal year 2010-2011, AFG projects net cash receipts from operations of $548,120.00, more than a 300% increase.[70] These numbers remain high in fiscal year 2011-2012 where cash receipts from operations are $420,000.00.[71] They stay at $486,228.00 for the following three years.[72]

The rationale behind this turnaround lies with cost-cutting that occurs in the 2010-2011 fiscal year. The following years simply retain those cuts. Cuts in expenses from

---

[68] Fourth Am. Disclosure Statement (Docket No. 297), Exs. B, C, and Debtor's Ex. A.

[69] *Id.*, Ex. D. I deducted $70,000 for a loan made by the shareholders to reach this number.

[70] *Id.*, Ex. E at 1. The debtor uses different terms for the same items in its projections. On the 2009-2010 fiscal year statement, Ex. D, it uses the phrase "ordinary profit before payment to creditors." In its 2010-2011 projections, Revised Ex. E, the debtor uses the phrase "net cash receipts from operations."

[71] Revised Exhibit E, page 1.

[72] Fourth Am. Disclosure Statement (Docket No. 297), Exs. G, H and I.

30

2009-2010 to 2010-2011 include: (1) $114,000.00 from cost of goods sold; (2) $156,817.00 from "other retail expenses;" (3) $226,473.00 from "ordinary overhead;" and (4) $35,233.00 from a roofing deposit. With these cuts, AFG alleges it will produce "net proceeds from operations" of more than half a million dollars in 2010 -2011, despite a "total revenue" decline of about $113,000.00 in that fiscal year. I agree that closing AFG's Anchorage store could lead to some cuts in overhead and other costs. The store is open now, however, and will remain open for the balance of the fiscal year. Because the store remains open, the debtor does not have the ability to make this kind of radical turnaround in the 2010-2011 fiscal year. While savings may be achieved in the years thereafter, they will not be as substantial or immediate as the debtor forecasts.

I conclude that the debtor's projection of $907,967.00 in accumulated working capital as of September 2015 is substantially overstated.


1129(b)(2)(A) and Cash Collateral

11 U.S.C. § 1129(b)(1) permits a plan to cramdown a claim "if the plan does not discriminate unfairly, and is fair and equitable with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." With respect to secured claims, a plan is fair and equitable to secured claims if it provides:

> (i)   (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the

debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii)  for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

(iii)  for the realization by such holders of the indubitable equivalent of such claims.[73]

All of FNBA's outstanding deeds of trust contain cross-collateralization clauses.  Each deed of trust obligation is placed into a separate class under the pending plan and, for each class, the plan provides that "FNBA's sole real property security shall be the real property described in the above referenced deed of trust."[74]  This provision effectively nullifies the cross-collateralization clauses found in FNBA's deeds of trust.  Because the plan

---

[73] 11 U.S.C. § 1129(b)(2)(A).

[74] Fourth Am. Plan (Docket No. 296), at 1-3.

32

will not permit FNBA to fully retain the liens securing its claims, it violates the cramdown provision of § 1129(b)(2)(A)(i)(I).[75]

      An alternative cramdown option is found in § 1129(b)(2)(A)(ii), which permits a sale free and clear with all liens attaching to the proceeds and the treatment of such liens as set forth in subsections (i) or (iii).  However, under this option the secured creditor must be given the option to enter a credit bid as provided under 11 U.S.C. § 363(k).  AFG's pending plan doesn't satisfy this cramdown option because there is no provision for credit bids by FNBA.  The Juneau sales proposed under the plan will pay FNBA the amount of its lien solely for that property at closing.  Further, as noted above, the sales would run afoul of subsection (i) because they do not recognize FNBA's cross-collateralization rights.  Nor do the provisions of subsection (iii) allow for a sale.

      A third method of cramdown is found in § 1129(b)(2)(A)(iii) – the creditor must realize the "indubitable equivalent" of its secured claim.  AFG's pending plan does not satisfy this subsection, either.  Through cramdown of the bank's cross-collateralization clauses, FNBA is forced to assume the risk of loss should one property sell for less than projected in 2015.  It can't look to another secured property to make up the difference.  In a case applying the indubitable equivalence standard to a dirt for debt chapter 11 plan, the Ninth Circuit stated:

> If FmHA subsequently sells the property for
> less than the value calculated by the bankruptcy

---

[75] *See Corestates Bank, N.A., v. United Chem. Tech., Inc.*, 202 B.R. 33, 50 (E.D. Penn. 1996).

court, FmHA has no recourse to the remaining collateral to satisfy the deficiency. As a result, the distribution to FmHA may not be "completely compensatory." *See In re Murel Holding Corp.*, 75 F.2d 941, 942 (2d Cir. 1935) (Learned Hand, J.). FmHA is forced to assume the risk of receiving less on the sale without being able to look to the remaining undistributed collateral for security. "[T]o the extent a debtor seeks to alter the collateral securing a creditor's loan, providing the 'indubitable equivalent' requires that the substitute collateral not increase the creditor's risk exposure." *In re Keller*, 157 B.R. 680, 683-684 (Bankr. E.D. Wash. 1993); *see also Aetna Realty Investors, Inc. v. Monarch Beach Ventures, Ltd. (In re Monarch Beach),* 166 B.R. 428, 436 (C.D. Cal. 1993) (fair and equitable prohibits a plan from unfairly shifting risk of plan failure to the creditor).[76]

The debtor's proposed cramdown does not provide FNBA with the indubitable equivalent of its secured claim. AFG seeks to alter FNBA's collateral through the plan. Elimination of the cross-collateralization provision increases FNBA's risk exposure without any commensurate benefit or substitute collateral and unfairly shifts the risk of plan failure to FNBA. The cramdown provisions in the debtor's fourth amended plan are not fair and equitable. The plan violates 11 U.S.C. § 1129(b)(2)(A).

Under 11 U.S.C. § 363(c)(2), a chapter 11 debtor cannot use cash collateral unless each entity that has an interest in such cash collateral consents or the court authorizes

---

[76] *Arnold & Baker Farms v. United States (In re Arnold and Baker Farms),* 85 F.3d 1415, 1422 (9th Cir. 1996) (footnote omitted)(adopting and quoting verbatim from the BAP's opinion in *United States v. Arnold and Baker Farms (In re Arnold and Baker Farms)*, 177 B.R. 648, 661-662 (B.A.P. 9th Cir. 1994).

such use.  Here, the debtor and FNBA entered into a stipulation for use of cash collateral at

the inception of the case.  The stipulation was approved by the court on August 24, 2009.[77]

It required the debtor to make payments of $25,000.00 per month to FNBA.  AFG has been

making these monthly payments.  FNBA has never alleged that the debtor has breached the

agreement.

            FNBA claims that the plan violates § 1129(b)(2)(A)(i)(I) because it does not

retain its liens against post-petition cash collateral.  While I agree that FNBA does not retain

all liens under the plan, the thrust of its argument here is directed more to the concept of

adequate protection under § 363(d).  Because the plan contemplates that FNBA's post-

confirmation cash collateral will be used to pay junior creditors and administrative claims

over the term of the plan, FNBA alleges that its liens are unlawfully impaired.  The current

value of FNBA's real property collateral is about $6 million.  Using FNBA's numbers at

confirmation and adding the estimated litigation expense claim of $1.7 million, FNBA's total

secured claim is $5.5 million.  FNBA also has a substantial § 506(b) attorney fee claim in this

bankruptcy proceeding which has not yet been liquidated.  The equity cushion in the real

property is very thin.  In *In re Griswold Building, LLC*,[78] a case cited by the bank, the lender

was undersecured and the debtor sought to use nearly $1.6 million in post-petition rents held

---

[77] Order Approving FNBA Cash Collateral Agreement, entered Aug. 24, 2009 (Docket No. 118).

[78] 420 B.R. 666 (E.D. Mich. 2009).

35

in a lockbox to pay other creditors. The court understandably found that the lender wasn't adequately protected.

While FNBA is  presently oversecured, the debtor's plan still must provide adequate protection for its future use of FNBA's cash collateral.  Here, FNBA's real property collateral is appreciating in value.  Over five years, the debtor will pay down the principal of the loans by 15%, with monthly payments to FNBA of $27,272.00.  That sum will increase when the cost claim is liquidated and wrapped into the monthly payments.  Assuming FNBA's litigation expense claim is allowed at $1.7 million with interest at 6%, the debtor will have to pay FNBA another $12,172.00 a month under the plan.  Those payments, totaling nearly $40,000 per month, should provide adequate protection for use of FNBA's cash collateral in the future.

FNBA argues that it must be paid in full before other creditors receive any payments, relying on *Central Bank of Montana v. Cascade Hydraulics.*[79] In *Cascade*, administrative creditors sought to recover on their claims under 11 U.S.C. § 506(c) against a secured creditor.  Section 506(c) allows a trustee to recover the costs and expenses of preserving and disposing of secured property, to the extent of any benefit provided to the secured creditor.  The Ninth Circuit also allows creditors who directly benefit the secured creditor to recover their similar costs and expenses.  The Ninth Circuit found that the administrative claimants were not entitled to § 506(c) costs because they failed to prove that

---

[79] *(In re Cascade Hydraulics)*, 815 F.2d 546 (9th Cir. 1987).

36

their claims were reasonable, necessary and beneficial to the secured creditor. No one has sought to recover § 506(c) costs from FNBA here, however, and *Cascade* is not a § 1129(b)(2)(A) case. It does not aid FNBA.

FNBA argues that cash collateral can only be used to pay operating expenses. It cites *In re Wilson*,[80] a chapter 12 case. The court in *Wilson* did discuss post-petition, pre-confirmation use of cash collateral. But it also recognized that a debtor can propose a plan which uses cash collateral to pay creditors so long as the secured creditor is adequately protected.[81] To hold otherwise would effectively make reorganization of any entity under chapter 11 or 12 impossible.

I conclude that AFG's fourth amended plan violates the cramdown provisions of 11 U.S.C. § 1129(b)(2)(A). However, the plan does not violate § 362(d) and FNBA does not have to be paid in full prior to AFG making payments to other creditors.

Miscellaneous

FNBA argues that the plan is not confirmable because the debtor's shareholders have not provided significant new value. The new value doctrine is viewed as an exception of the absolute priority rule codified in 11 U.S.C. § 1129(b)(2)(B)(ii). The absolute priority rule does not allow chapter 11 equity interests to retain any property when

---

[80] 378 B.R. 862 (Bankr. D. Mont. 2007).

[81] *Id.* at 889.

37

a dissenting class of unsecured claims is not paid in full.  Under the new value doctrine, shareholders of the debtor can retain an interest over the objection of a class of dissenting unsecured creditors by providing "new value."[82]  The shareholders must offer value that is "1) new, 2) substantial, 3) money or money's worth, 4) necessary for a successful reorganization and 5) reasonably equivalent to the value or interest received."[83]  Here, however, all the classes of unsecured creditors have accepted the plan.  Because there is no dissenting class of unsecured creditors, the new value exception is irrelevant.  FNBA, as a secured creditor to be paid in full under the plan, has no basis for objecting to confirmation on new value grounds.

At closing, FNBA argued against confirmation on fraudulent transfer grounds. Because H&A transferred real property to the debtor and the debtor then filed chapter 11 to avoid foreclosure, FNBA argues that H&A made a fraudulent transfer under state law.  That could well be the case.  The issue here, however, is whether AFG's chapter 11 plan has been proposed in good faith under 11 U.S.C. § 1129(a)(3).  Many commercial entities have filed for chapter 11 to avoid foreclosure and successfully reorganized.  It is well settled in the Ninth Circuit that "bankruptcy courts should determine a debtor's good faith on a case-by-

---

[82] *Bonner Mall P'ship v. U.S. Bancorp Mortg. Co. (In re Bonner Mall P'ship)*, 2 F.3d 899, 906-908 (9th Cir. 1993) (general discussion of new value exception).

[83] *Id.* at 908, *citing Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106, 121-22 (1939).

38

case basis, taking into account the particular features of each."[84] "A plan is proposed in good

faith where it achieves a result consistent with the objectives and purposes of the Code."[85]

Further, the fact that a creditor's contractual rights may be adversely affected by a plan does

not necessarily require a finding of bad faith.[86] Creditors are often unhappy with their

treatment under a plan, but this does not mean a plan is proposed in bad faith, provided their

treatment is permitted under the Code.[87] My review of AFG's fourth amended plan does not

cause me to believe that it was proposed in bad faith.


## IV.  Conversion or Dismissal

11 U.S.C. § 11129(b) provides, in part:

> (b)(1)  Except as provided in paragraph (2)
> of this subsection, subsection (c) of this section,
> and section 1104(a)(3), on request of a party in
> interest, and after notice and a hearing, absent
> unusual circumstances specifically identified by
> the court that establish that the requested
> conversion or dismissal is not in the best interests
> of creditors and the estate, the court shall convert
> a case under this chapter to a case under chapter
> 7 or dismiss a case under this chapter, whichever

---

[84] *Platinum Capital, Inc. v. Sylmar Plaza, L.P. (In re Sylmar Plaza, L.P.)*, 314 F.3d 1070 (9th Cir. 2002) (court found that solvent debtors, who filed chapter 11 after state court ordered judicial foreclosure and for the sole purpose of curing prepetition default and avoiding liability for default interest, had proposed plan in good faith).

[85] *Id.* at 1074, *citing Ryan v. Loui (In re Corey)*, 892 F.2d 829, 835 (9th Cir. 1989).

[86] *Sylmar Plaza*, 314 F.3d at 1075.

[87] *Id.*

39

is in the best interests of creditors and the estate, if the movant establishes cause.

(2)  The relief provided in paragraph (1) shall not be granted absent unusual circumstances specifically identified by the court that establish that such relief is not in the best interests of creditors and the estate, if the debtor or another part in interest objects and establishes that —

(A) there is a reasonable likelihood that a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) of this title, or if such sections do not apply, within a reasonable period of time; and

(B) the grounds for granting such relief include an act or omission of the debtor other than under paragraph (4)(A) –

(i)  for which there exists a reasonable justification for the act or omission; and

(ii) that will be cured within a reasonable period of time fixed by the court.[88]

---

[88] 11 U.S.C. § 1112(b)(1), (2).

"Cause" for dismissal or conversion is an expansive concept, and a bankruptcy court is not limited to the enumerated grounds for finding cause under § 1112.[89] A bankruptcy court has broad discretion to dismiss a Chapter 11 case for cause.[90]

This court moved, *sua sponte*, for dismissal or conversion of this case for cause under 11 U.S.C. § 1112(b)(1).[91]  The cause stated in the motion was the debtor's inability to obtain a confirmed plan of reorganization after 20 months in chapter 11.[92]  FNBA joined in the motion,[93] and sought conversion or dismissal on additional grounds, including specific subsections of § 1112.  FNBA seeks dismissal or conversion under § 1112(a)(4)(A) (substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation) and (a)(4)(B) (gross mismanagement of the estate).  The debtor has not filed a written response to the court's motion or FNBA's joinder, but has presented evidence and oral argument at the hearings in rebuttal to both.

This chapter 11 case is an outgrowth of the debtor's continuing battle with FNBA over losses arising from the Inn at Whittier.  After losing a lender liability suit against FNBA, AFG faced foreclosure on one of its Juneau properties.  AFG filed its chapter 11

---

[89] *In re Gonic Realty Trust,* 909 F.2d 624, 626 (1st Cir. 1990); *First Jersey National Bank v. Brown (In re Brown),* 951 F.2d 564, 572 (3rd Cir. 1991).

[90] *Matter of Woodbrook Associates*, 19 F.3d 312, 316 (7th Cir. 1994).

[91] Court's Mot. to Dismiss or Convert, filed Dec. 22, 2011 (Docket No. 288).

[92] *Id.*

[93] FNBA's Joinder in Court's Mot. to Dismiss or Convert, filed Jan. 21, 2011 (Docket No. 321).

41

petition on April 7, 2009 to avoid foreclosure.  Since that time, it has filed five disclosure statements and five plans,  none of which have been approved or confirmed.  AFG succeeded in obtaining a new trial of the state court action, but in December of 2010 it received a second unfavorable jury verdict.  Post-trial motions are still pending in the state action.  The court's *sua sponte* motion to dismiss or convert was filed after the second jury verdict was rendered.

This case has taken a long time to get to confirmation.  Despite this lengthy process, I am impressed by the value of the debtor's Juneau properties and the very real possibility of their substantial appreciation over the next several years.  Sales of the properties at appreciated values could yield substantial dividends to both FNBA and AFG's largest unsecured creditor, the Small Business Administration.  Accordingly, conversion or dismissal at this time is not in the best interests of creditors and the estate.  The dividends to unsecured creditors would be substantially diminished through conversion to chapter 7, or eliminated altogether by dismissal of the case.  I feel that AFG has the ability to remedy the defects outlined in this memorandum through:  1)  a revised disclosure statement and plan, 2) other pleadings in both this case and the H&A chapter 11 case, and 3) through the presentation of additional evidence at confirmation.

Under § 1112(b)(2)(A), I find that there is a reasonable likelihood that a plan will be confirmed within a reasonable period of time, which I determine to be 90 days.  I also find that the debtor's failure to obtain confirmation of a plan within 20 months of filing can

be cured within the 90 day period I an now setting under § 1129(b)(2)(B).  However, if the

debtor fails to obtain approval of its new disclosure statement and confirmation of its plan

within 90 days, this case will be converted to a case under chapter 7.  The conversion order

will be entered without further notice or hearing due to the debtor's failure to file a disclosure

statement and confirm a plan within a time fixed by order of the court.[94]

    FNBA's arguments regarding continuing loss and diminution to the estate and

the absence of a reasonable likelihood of rehabilitation are meritless at this point.  The debtor

has not grossly mismanaged the estate.  It has made all of the required adequate protection

payments to the bank.  This case will not be converted or dismissed at this time based on the

additional grounds for such relief stated in FNBA's joinder.


V. Professional Fee Applications

    AFG's counsel, Christianson & Spraker ("C&S"), has filed two applications

for allowance of interim attorney's fees.  The first application (Docket No. 224) was granted,

in part, on November 30, 2010, and 70% of C&S's requested fees ($101,902.67) and all of

its costs ($9,036.14) were allowed.  The remainder of those fees are still at issue.  C&S filed

its second fee application on January 1, 2011 (Docket No. 306 and errata at Docket No. 314).

C&S asks for an additional $86,619.50 in fees and $8,562.03 in costs.

--------

[94] 11 U.S.C. § 1112(a)(4)(J).

FNBA has objected to both applications on a variety of grounds.  It observes that C&S's total fees and costs exceed all profits AFG has made during the pendency of this chapter 11 case.  It asks why C&S should be allowed to recover fees for services provided in preparing disclosure statements and plans which were not approved or confirmed.  It also questions specific areas of billing, such as C&S's fees for the Glacier Gems state court litigation ($13,218.00), and C&S's fees and expenses for the H&A chapter 11 case.

The bulk of FNBA's objections will be overruled.  An award of attorney's fees to counsel for a debtor in possession is not contingent upon plan confirmation.  Disclosure statements and plans are frequently amended as a chapter 11 case progresses, and the fact that such amendments were made does not necessarily reflect upon the reasonableness of the fees requested.  I have reviewed the fee itemizations provided by C&S and find that the fees are, for the most part, reasonable.  I do, however, agree with FNBA on one point.  There is nothing in C&S's fee agreement which indicates that AFG would be responsible for H&A's chapter 11 fees and expenses.  Nor is there anything in the Code which would justify the treatment of H&A's attorney's fees as an administrative expense in this chapter 11 case.  Accordingly the following fees and costs, which C&S has billed for services provided to H&A, will be disallowed:

| Application | Fees Disallowed | Costs Disallowed |
|---|---|---|
| Application for Approval of Fees & Costs (Docket No. 224) | $2,918.00 | $1,039.00[95] |
| Second Application for Approval of Fees & Costs (Docket No. 306); Errata (Docket No. 314) | $505.50 | $0.00 |
| **Total Disallowed:** | **$3,423.50** | **$1,039.00** |

This disallowance is without prejudice to C&S seeking recovery of these fees in the H&A

chapter 11 case.

The balance of C&S's requested fees and costs will be allowed, as follows:

| Application | Fees | Costs |
|---|---|---|
| C&S's Application for Approval of Fees & Costs (Docket No. 224) | $142,657.25 | $7,997.14[96] |
| Less Amounts Previously Awarded (Docket No. 283): | $101,902.67 | $9,036.14 |
| Subtotal: | $40,754.58 | <$1,039.00> |
| C&S's Second Application for Approval of Fees & Costs (Docket No. 306); Errata (Docket No. 314) | $86,114.00 | $8,562.03 |
| **Total Awarded:** | **$126,868.58** | **$7,523.03** |

Also pending before the court is the second fee application of AFG's

accountants, Aasand & Glore (Docket No. 305). FNBA raises the same objections to this fee

---

[95] Disallowance of this cost in the AFG case is also appropriate because H&A has paid its own chapter 11 filing fee. *See* Disclosure of Compensation, filed Jul. 29, 2009 (Docket No. 4), in *In re Hernandez & Assoc., LLC*, Main Case No. A09-00516-DMD.

[96] This sum is less than the amount of costs awarded in the Order Granting Attorney Fees and Costs In Part, entered Nov. 30, 2010 (Docket No. 283). I am vacating that order, to the extent that it permitted C&S to recover H&A's filing fee as an administrative expense in the AFG chapter 11 case. This disallowed cost will be offset against the additional costs which C&S has requested in its second fee application.

45

application as it did to the ones filed by C&S.  These objections will be overruled, except as to the small portion of Aasand & Glore's requested fees which are attributable to work performed for H&A.  These fees, in the sum of $528.00, will be disallowed in this case, but without prejudice to Aasand & Glore  seeking recovery of these fees in the H&A chapter 11 case.  Accordingly, Aasand & Glore's second fee application will be allowed in the sum of $37,956.00.

## VI.  AFG's Motion to Approve Joint Agreement to Sell

AFG has filed a motion to approve joint agreement to sell property at 428 West Fourth Avenue in Anchorage (Docket No. 301).  The Anchorage property is the first parcel that AFG proposed to sell under its fourth amended plan.  Although the fourth amended plan will not be confirmed, it is appropriate for the debtor to move forward with this sale.  While AFG has been given a 90-day window to put forth a revised plan, a delay in granting the relief requested in the joint motion will severely impede its ongoing efforts towards successful confirmation.  No opposition to the motion has been filed.  The motion will be granted.

## VII.   Export Development Canada's Request for Administrative Expense

The final matter considered at the hearings was Export Development Canada's request for allowance of administrative expense priority claim (Docket No. 309).   A

46

determination on this request will be deferred pending AFG's further reorganization efforts. Export Development Canada's motion will be continued to the hearing on consideration of AFG's revised disclosure statement and plan, which has yet to be scheduled.

Conclusion

          For the reasons stated above, AFG's fourth amended disclosure statement will not be approved, and its fourth amended plan will not be confirmed. There are deficiencies in both documents which must be remedied. The disclosure statement must provide additional information, based upon the current status of both this chapter 11 case and the state court litigation. Further, more credible evidence as to real property values and plan feasibility is needed. AFG's treatment of FNBA's claim must satisfy the requirements of 11 U.S.C. § 1129(b)(1). This is just a brief summary of some of the points that are addressed in more detail above.

          The court's motion to dismiss or convert will not be granted at this time. AFG will be given a 90-day window to revise its disclosure statement and plan and obtain confirmation. The court will entertain motions for shortened time, if necessary, for AFG to meet this 90-day deadline. If AFG fails to obtain approval of a disclosure statement and confirmation of a plan by the expiration of this deadline, however, the court will convert this chapter 11 case to one under chapter 7 without further notice or hearing.

The fee applications of Christianson & Spraker and Aasand & Glore will be granted, with one reduction as to all applications.  None of the fees or costs related to H&A's chapter 11 case will be allowed here.  Allowance of those fees and costs should be requested in the H&A case.

The debtor's motion to approve joint agreement to sell will be granted.  The hearing on Export Development Canada's request for allowance of administrative expense priority claim will be put over to the time of the continued confirmation hearing, a date yet to be scheduled.

The court will set a scheduling conference so that the parties can discuss potential dates for any further hearings which may be required in this case.  An order will be entered consistent with this memorandum.

DATED:  April 29, 2011

BY THE COURT

/s/ Donald MacDonald IV
DONALD MacDONALD IV
United States Bankruptcy Judge

Serve:  C. Christianson, Esq.
        B. Moore, Esq.
        D. Bundy, Esq.
        R. Clifford, Esq.
        J. Beard, Esq.
        U. S. Trustee
        ECF Participants per NEF

        04/29/11