# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF ALASKA

In re:

ALASKA FUR GALLERY, INC.,

Debtor.

Case No. A09-00196-DMD
Chapter 11

Filed On

7/29/11

## SUPPLEMENTAL CONFIRMATION MEMORANDUM

The debtor, Alaska Fur Gallery, Inc. ("AFG") filed its chapter 11 petition on April 7, 2001. Its path to plan confirmation has been tortuous. AFG filed seven plans of reorganization before this court ultimately confirmed its most recent version, the modified sixth amended plan filed on July 18, 2011.[1]

There were several issues which AFG had to address before reaching confirmation. The adequacy of its disclosure statement was contested by AFG's secured creditor, First National Bank Alaska ("FNBA"), and one of its major unsecured creditors, Export Development Canada. AFG overcame this hurdle with its sixth amended disclosure statement,[2] which was approved by the court on June 28, 2011.[3]

Other issues existed with regard to AFG's various plans of reorganization. The court discussed those issues in several memoranda it issued during the course of this

---

[1] Debtor's Modified Sixth Am. Plan of Reorg., filed Jul. 18, 2011 (Docket No. 381).

[2] Debtor's Sixth Am. Disclosure Statement, filed Jun. 28, 2011 (Docket No. 365).

[3] Order Approving Sixth Am. Disclosure Statement, filed Jun. 28, 2011 (Docket No. 367); Amended Order Approving Sixth Am. Disclosure Statement, filed Jun. 28, 2011 (Docket No. 368).

chapter 11 proceeding, and the debtor's plan evolved accordingly. My memorandum regarding disclosure statement and plan confirmation dated April 29, 2011, detailed the remaining, unresolved issues in AFG's then pending plan.[4] AFG thereafter filed its sixth amended plan.[5] Hearings on confirmation of this plan were held on July 12 and 13, 2011. In a confirmation memorandum filed July 15, 2011, I found that AFG's sixth amended plan had addressed every confirmation issue raised in my April 29th memorandum but one.[6] AFG promptly filed its modified sixth amended plan to address this last issue. The changes found in the modified sixth amended plan were made to remedy a provision which I found violated state law. They favorably impact just one creditor, FNBA, and will have no appreciable effect on plan implementation or AFG's other creditors. They did not require additional disclosures to creditors. An order confirming the modified sixth amended plan was entered on July 21, 2011.[7]

This supplemental confirmation memorandum provides my rationale for confirming the plan. It will address each of the confirmation issues that I raised in my confirmation memoranda of April 29 and July 15, 2011.

---

[4] Mem. Regarding Disclosure Statement, Confirmation of Plan and Related Issues, filed Apr. 29, 2011 (Docket No. 342).

[5] Debtor's Sixth Am. Plan of Reorg., filed June 15, 2011 (Docket No. 352).

[6] Confirmation Mem., filed Jul, 15, 2011 (Docket No. 379).

[7] Order Confirming Alaska Fur Gallery, Inc.'s Modified Sixth Am. Plan of Reorg., filed Jul. 21, 2011 (Docket No. 386).

2

11 U.S.C. § 1129(a)(1) and (a)(3):

In my April 29 memorandum, I found that AFG's earlier plans failed to comply with § 1129(a)(1) because they did not comply with all applicable provisions of Title 11. Specifically, AFG's earlier plans did not satisfy various provisions found in § 1123(a). Section 1123(a)(1) requires a plan to designate classes of interests. The plan must set forth any class of interests that is not impaired and, if a class of interests is impaired, the plan must specify treatment of such class.[8] Both AFG's sixth amended plan and its modified sixth amended plan corrected this deficiency. In both plans, a new Class E was added to Article 1, which provides that the debtor's equity interests are unimpaired under the plan.[9] Article 1, Class E, also provides that AFG is to amend its articles of incorporation to prohibit any class of equities other than voting stock.[10] The plan now satisfies the requirements of § 1123(a) and, thus, complies with the applicable provisions of Title 11.

Section 1129(a)(3) requires that a plan be "proposed in good faith and not by any means forbidden by law."[11] FNBA argued that earlier plans didn't comply with state law because they proposed the transfer of real property belonging to a related entity, Hernandez & Associates ("H&A"), to fund AFG's reorganization without first paying the creditors of

---

[8] 11 U.S.C. § 1123(a)(2), (3).

[9] Debtor's Sixth Am. Plan of Reorg. (Docket No. 352), at 12; Debtor's Modified Sixth Am. Plan of Reorg. (Docket No. 381), at 12.

[10] *Id.*

[11] 11 U.S.C. § 1129(a)(3).

3

H&A. FNBA is a creditor of both AFG and H&A. I agreed with FNBA on this point.[12] The modified sixth amended plan remedies this defect. The real property at issue now passes to FNBA, who is H&A's only remaining creditor. AFG has substituted other real property to fund the obligations that the H&A parcel was to pay. Because the plan now complies with state law, it satisfies the requirements of § 1129(a)(3).

11 U.S.C. § 1129(a)(11):

Section 1129(a)(11) deals with plan feasibility. The debtor must establish that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."[13] The controlling case law on plan feasibility was set forth in my April 29 memorandum, and is incorporated by reference herein.[14]

The feasibility of AFG's plan is dependent upon the sale or refinancing of loans upon various parcels of real property that it owns. Whether those parcels had adequate value to fund the plan was highly contested. In my April 29 memorandum, I found that AFG had not made an adequate showing regarding the values of several of its parcels. I also

---

[12] *See* Mem. Regarding Disclosure Statement, Confirmation of Plan and Related Motions (Docket No. 342), at 16-20.

[13] 11 U.S.C. § 1129(a)(11).

[14] *See* Mem. Regarding Disclosure Statement, Confirmation of Plan and Related Motions (Docket No. 342), at 20-22.

4

indicated that it appeared the market for some of these parcels was bleak and that AFG's business projections were overly optimistic. AFG has rectified these issues through the exhibits to its sixth amended disclosure statement and the testimony provided at the July confirmation hearings.

The plan calls for the sale of the debtor's Anchorage store, and projects a gross sale price for this parcel of $1,050,000 in October, 2011. The debtor called Marc Dunne, an Anchorage commercial real estate broker, to testify as to the value of the store and an adjacent lot. Dunne valued the store at between $900,000 and $1.2 million.[15] He valued the lot at $416,000 to $455,000.[16] There is interest in the property. An adjacent landowner has indicated he may offer $800,000 for the store and $416,000 for the lot. The store is listed for sale at $1.49 million. If it sold for $1.05 million, a price within Dunne's range of values, AFG would net $316,000, assuming transaction costs of 8%.[17] I conclude that the debtor has sustained its burden of proof in establishing value for the Anchorage store.

During the last round of confirmation hearings in February of 2011, the debtor was forced to withdraw its valuations of the Skagway properties. Since then, the debtor has had appraisals performed on these parcels. Kim Wold valued each of the properties at

---

[15] Debtor's Sixth Am. Disclosure Statement (Docket No. 365), Ex. Q-5.

[16] *Id.*, Ex. Q-6.

[17] Under its current lease agreement, AFG must pay its landlord $650,000 for its interest in the property. *Id.*, Ex. K.

5

$435,000.[18] He testified regarding these appraisals at the July 13, 2011, continued confirmation hearing. The debtor has adopted Wold's values in its projections. I find Wold's valuations to be credible and conclude that AFG has sustained its burden of proof with regard to the value of the Skagway properties.

Wold also testified regarding the Juneau-Skagway tourist business climate. He is bullish on Southeast Alaska tourism. Wold stated that sales are up in 2011. Businesses he interviewed showed increases of 5 to 17% over 2010. While some high-end jewelry stores are not seeing such increases due to the high costs of gold and diamonds on the world market, other businesses are doing well. Wold testified that Southeast cruise ship traffic will increase by 60,000 passengers in 2012. Passenger traffic will increase substantially in 2013 and 2014 as well. Wold predicts that 2014 will be a record year, with passengers in excess of 1,060,000, the all-time record. He expects growth to continue in the years after 2014. He projects a strong appreciation of real estate values, too. Annual appreciation of 4 to 6% in value for the AFG's Southeast real property holdings is conservative, under his view.

The debtor's actual retail performance for 2011 has been substantially over projections. Sales for May were 34% over projections. Actual receipts were $147,044 versus projections of $109,500. The sales for June were even more encouraging. AFG's projected sales were $200,260, while its actual sales were $321,487. This equates to a 61%

---

[18] *Id.*, Exs. Q-3 and Q-4.

increase in sales. If this trend continues, net cash receipts from AFG's operations could increase $140,000 during the 2010-2011 fiscal year, rising to $587,000.[19]

In the face of this evidence, my prior conclusions as to appreciation of the Juneau and Skagway properties were too conservative. I find that appreciation of 6% a year is appropriate for AFG's Juneau and Skagway properties, throughout the five year plan term. This means that the values shown in AFG's projections are realistic. With regard to the Juneau parcel located at 317 South Franklin Street, values should increase $215,000 per year on a base value of $3.585 million.[20] On the 359 South Franklin property, values should increase $145,200 per year on a base value of $2.42 million.[21] AFG's property at 363 Second Avenue in Skagway should appreciate about $26,100 annually on a base year appraisal of $435,000.[22] AFG has sustained its burden of proof in establishing the values of the Juneau and Skagway properties.

AFG's plan is to be funded in large part through the refinance or sale of its real property. The first option would be to refinance in 2014, if that proves feasible. AFG's key assumptions underlying the refinance option are set forth in Exhibit K to the sixth amended

---

[19] *See* Debtor's Sixth Am. Disclosure Statement (Docket No. 365), Ex. E at 1 (AFG's projected net cash receipts from operations). I assumed a 50% increase in sales for July, August and September. I discounted those sales by 80% to cover expenses, and ended up with an increase in net cash receipts from operations of $140,000.

[20] *Id.*, Ex. Q-1.

[21] *Id.*, Ex. Q-2.

[22] *Id.*, Ex. Q-4.

7

disclosure statement.[23] The values in the exhibit slightly understate the revised values I have found relative to the latest plan. For example, AFG assumes a value of $4,032,637 for the 317 South Franklin property in 2014. In light of the testimony provided at the July confirmation hearings, I feel it is realistic to project a value of $4.230 million for this parcel in 2014. Similarly, AFG's assumed value for the 359 South Franklin property in 2014 is $2,722,171, while I find that a realistic projected value for this parcel would be $2.855 million. AFG's value assumptions are well supported by the evidence.

In my April 29 memorandum, I stated that the debtor's ability to obtain refinancing needed to be addressed. AFG offered the testimony of Kim Wold with respect to refinancing its Juneau and Skagway properties. Wold is knowledgeable regarding the financing available on commercial properties in the Southeast. He stated that loans are available for real estate similar to AFG's Juneau properties through the Alaska Industrial Development and Export Authority ("AIDEA") and local banks. These loans have up to a 75% loan to value ratio over a 20 to 25 year term. Fixed rate loans are being offered at interest rates from 6.25% to 6.75%. Variable rate loans are also available, currently with a five year fixed term of about 5.75%. With the AIDEA loans, 90% of the loan would be funded by AIDEA and 10% by a local lender.[24] Fees for the loans would run from 2.5 to 3 points. Participating lenders could include Wells Fargo, Key Bank, First Bank, and Alaska-

---

[23] Debtor's Sixth Am. Disclosure Statement (Docket No. 365), Ex. K.

[24] This equates with 67.5% of value held by AIDEA and 7.5% of value held by the participating lender.

8

Pacific Bank. AIDEA loans are not viable for properties worth less than $1 million. AFG's remaining Skagway property would have to be financed solely through a bank, without AIDEA participation. Wold thought that 20 year loans with a 75% loan to value percentage would be available for this property. Interest rates would vary from 6.25% to 6.75%.

I believe AFG would be a strong candidate for refinancing of its Juneau and Skagway parcels in the fall of 2014. AFG's current business performance has exceeded its projections. It will have the benefit of three strong years of improving performance following confirmation of its plan. Further, Wold has presented an optimistic view for the Southeast Alaska business and real estate climate. The commercial real estate market is strong, and 2014 should be a record year for cruise ship traffic. Through a refinance, AFG could pay all existing creditors, including FNBA, with the exception of Class S1-G. The debtor would still retain substantial assets to pay Class S1-G.

The fly in the ointment, with regard to AFG's refinance option, is that the Class S-1G claim has not yet been liquidated. This claim is for FNBA's litigation costs incurred in protracted state court litigation which AFG initiated, prepetition.[25] A second trial has been completed but several post-trial motions are still pending, including the liquidation of FNBA's cost claim. If the state court were to rule in favor of the bank on every issue, FNBA's cost claim could reach as much as $2 million. If AFG's arguments prevail, FNBA

---

[25] The history of AFG's state court litigation is detailed in my earlier Memorandum Regarding Disclosure Statement, Confirmation of Plan and Related Motions (Docket No. 342), at 3-5. In that memorandum, I estimated FNBA's cost claim to be a secured claim for $1.7 million. *Id.* at 27-28.

9

could end up with nothing. Assuming FNBA ultimately prevailed on this issue, the amount of the S-1G Class could kill a refinance of the debtor's properties. AFG would then be forced to liquidate its holdings within the five year plan period.

Under my calculations, AFG would have the ability to pay all creditors in full plus commit $1.3 million to the S-1G Class through liquidation of its real property in 2016. AFG's real estate holdings would appreciate to more than $8.371 million by then. Transaction costs would consume roughly 6% of the sales, or $502,000, leaving a balance for creditors of $7.879 million. Assuming $1.3 million for Class S-1G, the total of all creditors' claims would be about $6.5 million.[26] Without the refinance, the debtor would also have about $700,000 in working capital freed up.[27] This sum would more than cover accrued interest on Class S-1G over a four year period, assuming the state court makes a prompt decision. Without the refinance, AFG can continue to pay FNBA its monthly payments from rental and business income until the properties are sold. I find that the debtor has the ability to survive a worst-case scenario.

Despite FNBA's arguments to the contrary, there are strong reasons for estimating its litigation cost claim significantly lower than $2 million. First of all, FNBA

---

[26] I computed the outstanding claims conservatively, using the balances set forth in Exhibit K of the Sixth Amended Disclosure Statement (Docket No. 364) to determine the dollar amount of outstanding claims as of September 2014. I did not make any further deductions for principal payments during October through December of 2014 or for payments made in 2015. I deducted $400,000 for the H&A Skagway property which FNBA will receive.

[27] Debtor's Sixth Am. Disclosure Statement (Docket No. 365), Ex. H at 1. AFG's projected beginning working capital for September, 2014, is $686,619.

10

has not filed an updated claim that reflects all of its litigation costs. Nor did FNBA submit any evidence as to these costs at the confirmation hearing. Its Claim No. 29-1 was filed on June 5, 2009, before the second state court trial was held. This claim was for $852,290.40 in litigation costs. However, a "billing audit" attached to this claim reflects that several of the itemized bills have not yet been paid by FNBA. Further, some of the amounts billed are very sizeable, but no itemization is provided to support the sums billed. The largest is a statement dated September 30, 2008, from Grant Callow, for a total of $283,272.19. There is no itemization for this bill, nor is one provided for any of the other large statements the bank lists, from Messrs. Beard, Dodge and Branson. AFG's counsel has asked for more information about these costs from FNBA. The bank's counsel, Bruce Moore, advises that FNBA's attorneys in the state court action are behind on their billings. There may be an additional $1 million in unbilled charges, raising the apparent cost claim to $1,870,559. I have no information regarding the hourly rates charged by these attorneys for their services or the total amount of costs advanced by them.

      I earlier estimated FNBA's cost claim at $1.7 million.[28] This figure was reached by taking the costs for the first trial and doubling them, not a precise standard. Moreover, FNBA's contractual agreement with the debtor only entitles it to *reasonable* attorney's fees and costs. I think the new state court judge will have sticker shock over the

---

[28] Memorandum Regarding Disclosure Statement, Confirmation of Plan and Related Motions (Docket No. 342), at 27-28.

11

amount of attorney's fees FNBA claims in this case.[29] Assuming fees of $2 million, FNBA has spent an average of $167,000 per week for 12 weeks of trial. It is apparently being charged as much or more for the second trial than for the first. From my perspective, discovery and the initial trial experience should have resulted in lower costs for the bank for the second trial, not more. For these reasons, and because of the lack of evidence from FNBA, I will downgrade my initial estimate of its cost claim. I now estimate the reasonable attorney's fees and costs awarded to FNBA by the state court to be $1.3 million. AFG has the ability to pay this claim over a five year term, with interest.

AFG will accumulate working capital over the life of the plan. My reservations as to the debtor's cash flow calculations have been resolved favorably to the debtor. Pages 44 through 49 of the sixth amended disclosure statement itemize the debtor's improved cash flow. The cash reserves projected by AFG have a reasonable basis and AFG is beating those projections by a substantial margin. It will have the ability to pay FNBA's claims over the life of the plan, including Class S-1G. I conclude AFG's plan is feasible.

11 U.S.C. § 1129(b)(2)(A):

Section 1129(b)(1) permits a plan to cramdown a claim "if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or

---

[29] The state court judge who presided over the two trials has retired, and the state court action has been assigned to a new judge.

interests that is impaired under, and has not accepted, the plan."[30] With respect to secured claims, a plan is fair and equitable if it provides:

> (i) (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and
>
> (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;
>
> (ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or
>
> (iii) for the realization by such holders of the indubitable equivalent of such claims.[31]

In my April 29 memorandum, I concluded that the plan failed to provide FNBA with the "indubitable equivalent" of its claims because it effectively nullified FNBA's cross-

---

[30] 11 U.S.C. § 1129(b)(1).

[31] 11 U.S.C. § 1129(b)(2)(A).

13

collateralization clauses.[32] At a subsequent hearing, FNBA graciously conceded this point. Indubitable equivalence is no longer an issue with regard to confirmation here.

In its modified sixth amended plan, AFG seeks to cramdown four FNBA secured claims. Each claim is placed in a separate class: (1) Class S-1A for about $728,000, (2) Class S-1B for about $1.8 million, (3) Class S-1D for about $1.4 million, and (4) Class S-1G, FNBA's unliquidated cost claim. The treatment of the first three claims is similar. Interest will accrue on these claims at their current contractual rates over a period of five years. The claims are amortized over a 20 year period with a balloon payment due in five years. Class S-1A has a current rate of prime plus 1.5% with a minimum of 6.75%. AFG seeks to fix this 6.75% rate over the five year term of the plan. Class S-1B is also at prime plus 1.5% with a minimum of 6%. AFG seeks to fix this 6% rate over the five year term of the plan as well. Class S-1D has a current rate of prime plus two with a minimum of 6%. Again, AFG wants to keep this 6% rate over the five year term of the plan. Once determined by the state court, Class S1-G will be amortized over 20 years. Its applicable interest rate will be 6% or the rate established by the state court, whichever is less. It is to be paid in full within the 5 year term of the plan, once it has been liquidated by the state court.

Classes S-1A, S-1B and S-1D all retain their liens in accordance with § 1129(b)(2)(A)(i)(I). Each one will receive the present value of its claim. They are all well secured by prime commercial real estate in Juneau, Alaska. Classes S-1A and S-1B, with

---

[32] Memorandum Regarding Disclosure Statement, Confirmation of Plan and Related Motions (Docket No. 342), at 32-33.

claims totaling roughly $2.5 million, are secured by appreciating real property on 317 South Franklin Street, which has a current appraised value of $3.585 million. These classes are receiving the present value of their claims with interest at 6.75% and 6%, respectively. Prime is currently 3.25%. Any risk factor is more than accommodated by the 3.25% and 2.75% margins above prime.[33] FNBA's S-1D claim is also very well secured by appreciating property in a prime retail district. The property at 359 South Franklin is worth $2.42 million and the banks's claim is about $1.4 million. The risk factor on this claim is well accommodated by the 2.75% margin above prime. AFG's cramdown of Classes S-1A, S-1B and S-1D is consistent with the Code.

      Not so with Class S-1G, however. The modified sixth amended plan proposes reasonable payments to this class, similar to those for S-1A, S-1B and S-1D, with a 20 year amortization and a five year balloon. The estimated claim is well secured and will carry a reasonable interest rate of 6%.[34] But the plan states that "[s]o long as FNBA is receiving the payments called for in this paragraph, Debtor may sell any real property or real property interest owned by it, free and clear of any lien securing payment of this claim."[35] This provision will strip FNBA of its collateral without compensation. There can be no cramdown

---

[33] *Farm Credit Bank of Spokane v. Fowler (In re Fowler),* 903 F.2d 694, 696-99 (9th Cir. 1990).

[34] While the plan says the lower of 6% or the rate determined by the state court, given First National's loan documentation the rate can't be lower than 6%.

[35] Modified Sixth Am. Plan (Docket No. 381), at 6.

15

unless FNBA retains its lien. The provision violates § 1129(b)(2)(A)(i)(I). It must be deleted from the plan.

Because its treatment of Class S-1G violates the cramdown provisions of the Code, AFG must promptly move to modify the plan under 11 U.S.C. § 1127(b) or seek other appropriate relief. Prior to any motion, however, I feel that it is appropriate for the debtor meet and confer with FNBA and the court to discuss cramdown and any other issues raised by this memorandum or the parties. An order setting a status conference will be entered concurrently with this memorandum.

DATED: July 29, 2011.

>BY THE COURT
>
>/s/ Donald MacDonald IV
>DONALD MacDONALD IV
>United States Bankruptcy Judge

Serve:    C. Christianson, Esq.
         B. Moore, Esq.
         D. Bundy, Esq.
         R. Clifford, Esq.
         J. Beard, Esq.
         U. S. Trustee

         07/29/11